IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

FILED IN OPEN COURT
NOV 27 2012
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **CRIMINAL NO. 2:12cr127** |
| ) | |
| **DAVID LEE JONES, III,** ) | |
| ) | |
| **Defendant.** ) | |

### STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

1. Since March 2012, the Department of Homeland Security Investigations (HSI) has been investigating the suspected importation of 3,4- Methylenedioxy-N-methcathinone (Methylone), a Schedule I controlled substance, into the United States from China. On the evening of June 1, 2012, members of the Hampton Roads Border Enforcement Security Task Force (HR-BEST), a division of HSI, and members of the Portsmouth Police Department's Special Investigation Unit (SIU) conducted received information from a cooperating defendant (CD#1) at his residence in the City of Portsmouth.

2. CD#1 was apprised of the fact that he was the target of an ongoing federal narcotics investigation and consented to being interviewed by HR-BEST agents. Additionally, CD#1 gave

1



members of the investigative team consent to search his residence for contraband. During the consensual interview of CD#1 at his residence, CD#1 admitted to having imported multiple kilograms of Methylone and smaller quantities of 2,5-dimethoxy-4-iodophenethylamine (2C-I) from China. He stated he ordered between ten or eleven orders since the summer of 2011, ordering three (3) kilograms of Methylone at a time. His most recent order from the Chinese laboratory was in April 2012.

3. CD#1 stated that during the summer of 2011, he sold the Methylone he received from China, on his own, to individuals at various "raves" and nightclubs in the Eastern District of Virginia, but after a short period of time doing this, began to wholesale the imported Methylone to the Defendant David Lee Jones, III, (hereinafter "Jones") for Jones to distribute.

4. When Jones would pick up the Methylone, the December Isabelle Justice (hereinafter "Justice") would often come with him. According to CD#1, he would "front" multiple kilograms to Jones at a time with the agreement that Jones would re-pay CD#1 $6,000 for one kilogram of Methylone or $10,000 for three (3) kilograms he received.

5. On July 12, 2012, CD#1 agreed to place a monitored telephone call to Jones to apprise Jones of the fact that a three (3) kilogram package of Methylone (which CD#1 called "Molly") had just arrived from China. (HR-BEST agents substituted non-narcotic substances in the three (3) separate kilogram sealed Mylar bags for the encounter). Additionally, CD#1 asked Jones if he currently had any marijuana. Jones agreed to travel to CD#1's home to retrieve the narcotics and to bring CD#1 a quantity of marijuana.



6. Members of the investigative team established surveillance of Jones's residence and observed Jones exit his residence and travel to CD#1's residence with Justice.

7. Upon arriving at CD#1's residence, Jones and Justice entered the location together. Jones delivered a quantity of marijuana and $1,000 to CD#1, and along with Justice, accepted three one-kilogram silver packages of what they both believed to be "Molly," the slang CD#1 had used for the Methylone. During this encounter, members of the investigative team covertly monitored this interaction from a location within CD#1's residence. Subsequent to this transaction, both Jones and Justice departed CD#1's residence.

8. After departing CD#1's residence, Justice's vehicle was stopped by a marked Portsmouth Police Department vehicle for traffic violations. Justice and Jones were removed from the vehicle. Inside the vehicle, the three silver packages were located inside Justice's gray purse.

9. Jones was given his *Miranda* rights at the scene which he waived orally and again waived in writing once at his Portsmouth residence. Jones elected to make a statement to HR-BEST agents. Jones admitted that he had received "Molly" from CD#1. He stated that he had been receiving drugs from CD#1 for approximately a year.

10. Subsequent to their on-scene interview, Jones gave written consent to search his residence at on Johnson Avenue in Portsmouth, Virginia for the presence of contraband. He escorted officers to the bedroom he shared with Justice. A .32 caliber handgun was recovered from inside a small safe in the bedroom. Further, from the same bedroom, officers recovered a digital scale with suspected narcotic residue on its surface, empty gel capsules used for packaging the Methylone, and other packaging materials.

3



11. At the house, agents continued their interview with Jones. Jones stated that he began selling "Molly" during the summer of 2011 at various raves and clubs within the Eastern District of Virginia and in the District of Maryland. Jones stated that he began purchasing quantities of "Molly" from CD#1 during the fall of 2011. Jones further stated that CD#1 told him that the "Molly" came from "overseas," but that CD#1 was not more specific as to which particular country from which the "Molly" originated. Jones stated that he would pay CD#1 $10,000 per three kilogram purchase of "Molly."

12. Jones' first purchase of "Molly" from CD#1 was approximately one to two ounces for $150 per ounce. Subsequent to this purchase, Jones purchased between one and three kilograms of "Molly" every two weeks from CD#1. Jones stated that he has purchased between fifteen and twenty kilograms of "Molly" from CD#1 over the course of approximately twenty transactions spanning the approximate one year period that he had been buying "Molly" from CD#1.

13. Jones retailed ounce quantities of "Molly" to multiple individuals at various music events such as: "Crystal Method" concerts, "Starscape," and various "Dubstep" and "Techno" concerts within the Eastern District of Virginia and the District of Maryland. Jones estimated that he sold approximately fifteen kilograms of "Molly" to individuals during the past year at various locations in the Richmond, Virginia area.

14. The acts of the defendant in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further



acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: _____
Amy E. Cross
Special Assistant United States Attorney

Defendant's Signature:   After consulting with my attorneys and pursuant to the plea agreement entered into this day between myself, the United States and my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*[signature]*
David Lee Jones, Jr.
Defendant


Defense Counsel's Signature:   I am David Lee Jones, Jr.'s attorney. I have carefully reviewed the above Statement of Facts with him. To the best of my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

*[signature]*
Benjamin H. Hamlet, Esquire
Counsel for the Defendant